**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| MERCHANTS TERMINAL CORP., | * | |
|  | * | |
| v. | * | Case No. SAG-09-CV-2065 |
|  | * | |
| L&O TRANSPORT, INC., *et al.* | * | |
|  | ****** | |

**MEMORANDUM**

Pending before this court is a motion for summary judgment filed by defendant L&O Transport, Inc. ("L&O") [ECF No. 48], and a motion for summary judgment filed by plaintiff Merchants Terminal Corporation ("Merchants") [ECF No. 49]. The issues in this case have been fully briefed and no oral argument is necessary. *See* Local Rule 105.6 (D. Md. 2011). For the reasons set forth below, both motions will be denied.

**I.   Factual Background**

The issues in this case relate to a shipment of wild salmon which was stolen from Merchants' terminal. Defendant L&O Transport, Inc. is a licensed and insured motor carrier. (Elmore Dep. at 47-48). Charles Elmore is a truck owner/operator who works under owner/operator agreements with various motor carriers to obtain port access and insurance. (Elmore Dep. at 7, 11, 16, 47-48). Merchants hires motor carriers and truck operators to transport containers. (Halpert 8/12/2011 Aff. at 1). Elmore has transported containers for Merchants since approximately 2004. (Elmore Dep. at 23-24, 47-48). Merchants required Elmore to have an owner/operator agreement in place to transport its containers. (Halpert 8/12/2011 Aff. at 2). In July of 2008, Elmore provided Merchants with documentation demonstrating that he had an owner/operator agreement with L&O Transport ("the

Owner/Operator Agreement"). (Elmore Dep. at 11). The Owner/Operator Agreement was signed by Otto Thompson on behalf of L&O. (Elmore Dep. at 12, 18). Thompson, on behalf of L&O, also provided Merchants with a certificate of insurance when the owner/operator lease agreement with Elmore was signed. (Elmore Dep. at 19). Any payments Elmore made to L&O were made directly to Thompson in cash, and Thompson did not provide Elmore with any type of receipt. (Elmore Dep. at 77-78).

As a motor carrier, L&O had an Interchange Agreement at the Port of Baltimore ("the Interchange Agreement"), which allowed authorized drivers from L&O to pick up containers at the port for delivery. (Elmore Dep. at 18). For Elmore to be able to pick up containers at the port, a representative of L&O had to notify the port that Elmore and his drivers were authorized under L&O's Interchange Agreement. (Elmore Dep. at 18). Elmore received his work assignments from Merchants, not from L&O. (Elmore Dep. at 41).

On October 20, 2008, Elmore, through his driver, Rick Arlee, picked up a full cargo container for Merchants at the Port of Baltimore using the Interchange Agreement. (Elmore Dep. at 26, 30). In picking up the container, Elmore and Arlee used the authority of L&O's Interchange Agreement. (Elmore Dep. at 23). An interchange ticket was therefore issued to L&O. (Elmore Dep. at 23, Halpert 8/12/2011 Aff. Exh. A). The interchange ticket indicates that Arlee received the container at 10:35 A.M. on October 20, 2008. (Halpert 8/12/2011 Aff. Exh. A). That container was delivered to Merchants' facility in Delaware and unloaded. (Elmore Dep. at 27).

The next day, at Merchants' request, Elmore and Arlee returned to Delaware to use the then-empty container to transport a shipment of wild caught salmon from Delaware to Merchants' terminal in Maryland. (Elmore Dep. at 28). The Interchange Agreement does not

permit refrigerated containers to be reloaded with new cargo after delivery from the port to the original destination. (Elmore Dep. at 68-69). L&O had no knowledge that the container was being reloaded with salmon to transport back to Baltimore from Delaware.[1] (Elmore Dep. at 91). The bill of lading for the shipment of salmon does not list a driver's name or signature, and does not contain the names L&O, Elmore, or Arlee at all. (Halpert 8/12/2011 Aff. Exh. B).

After picking up the salmon shipment, Elmore and Arlee transported the container of salmon to Merchants' terminal in Maryland. (Elmore Dep. at 29). They arrived in the early morning hours, when Merchants' terminal was closed. (Elmore Dep. at 29-30). Following procedures Elmore had established with Merchants, Elmore unlocked the gate to Merchants' terminal using a key provided by Merchants. (Elmore Dep. at 30, 33, 38-39, 51). Elmore observed Arlee in a position to place a kingpin lock on the full container to secure it, although Elmore did not actually see Arlee locking the container. (Elmore Dep. at 31). Arlee told Elmore he had secured the kingpin lock on the container. (Elmore Dep. at 60). The kingpin lock belonged to Elmore and Elmore had the key. (Elmore Dep. at 32). Elmore then re-locked the yard gate. (Elmore Dep. at 31). After traveling to another location to pick up containers, Elmore arrived back at Merchants' Baltimore yard at 5:30 a.m. (Elmore Dep. at 35-36). Elmore slept in his truck outside the gate until he was awoken by a Merchants' supervisor at 6:30 a.m. (Elmore Dep. at 36-37). The supervisor asked Elmore who had cut the lock on the gate. (Elmore Dep. at 37). When Elmore drove his truck into Merchants' yard, he noticed that the container was no longer in the yard. (Elmore Dep. at 37-38).

---

[1] This court granted a motion to dismiss Merchants' complaint against Elmore based on the allegations in the Amended Complaint, which stated that the container of salmon was "caused to be delivered into the care and custody of Defendant L&O" and that "L&O agreed to forward and deliver [the salmon container] to Merchants in Baltimore, Maryland." Amd. Compl. at 6. Elmore's deposition testimony evidences a very different set of facts regarding L&O's involvement in the transaction.

3

If the container had been present, upon his entry into Merchants' yard, Elmore would have used his key to unlock the kingpin lock. (Draper Aff. at 4; Elmore Dep. at 93, 95-96). He would then have given the delivery order to the customer service manager. (Draper Aff. at 3). The seal on the container would have been broken, the container would have been unloaded, and Merchants would have checked that the goods matched the description on the receiving documents. (Draper Aff. at 3). If the goods matched, Merchants would have stamped the order to acknowledge receipt. (Draper Aff. at 3). Otherwise, Merchants would have noted any shortage or damage. (Draper Aff. at 3).

Instead, Elmore and Merchants began searching for the stolen container. (Elmore Dep. at 33). Merchants eventually recovered the stolen container, though some of the salmon cartons were missing. (Halpert 8/12/2011 Aff. at 3). After testing the salmon that remained in the container, Merchants sold the remaining shipment for salvage. (Halpert 8/12/2011 Aff. at 3). Merchants entered into a written settlement agreement with its customer, The Fishin' Company ("TFC"), under which Merchants reimbursed TFC for the full value of the shipment and TFC assigned its legal rights to pursue claims to Merchants. (Halpert 8/12/2011 Aff. at 3).

Sometime before this incident, L&O had contacted eModal, the company administering the interchange authorizations at the port, to advise that Elmore's drivers were no longer authorized to pick up shipments under L&O's Interchange Agreement. (Sanders Aff. at 7). The interchange authorization was inactivated on October 20, 2008, approximately 20 minutes before Elmore and Arlee picked up the container in question. (Sanders Aff. at 8). On the Monday after the container was stolen, Elmore could not pick up at the port because L&O had cancelled his trucker's code under the Interchange Agreement. (Elmore Dep. at 21, 40).

## II.     Legal Standards

A motion for summary judgment is granted under Rule 56 of the Federal Rules of Civil Procedure if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 884 (1990). Summary judgment is precluded only when there are disputes over the facts that might affect the outcome of the proceedings under the applicable law. Factual disputes that are not relevant or not necessary will not be considered in a summary judgment motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A party seeking summary judgment bears the burden of showing that there is not evidence to support the non-moving party's case, and the moving party must only show an absence of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In response, the non-moving party must show that there is a genuine issue for trial. A court must decide whether there is a genuine issue for trial, "not . . . weigh the evidence and determine the truth of the matter." *Anderson*, 477 U.S. at 242-43.

The Carmack Amendment provides shippers with the right to sue carriers for damage or diminishment to goods during transport. 49 U.S.C. § 14706(a)(1). The statute defines a carrier as "a person providing motor vehicle transportation for compensation." 49 USC 13102(12). If Merchants states a *prima facie* case under the Carmack Amendment, a presumption of negligence on the part of the carrier arises. The elements of a *prima facie* case include (1) delivery of the cargo in good condition to the carrier, (2) arrival in short or damaged condition, and (3) the amount of damages. *Missouri Pacific Railroad v. Elmore & Stahl*, 377 U.S. 134, 137-38 (1964). If the shipper successfully establishes a *prima facie* case, the burden shifts to the carrier to establish (1) that it was free from negligence and (2) that the damage to the cargo was

due to one of several excepted causes: an act of God, the public enemy, the act of the shipper himself, public authority, or the inherent vice or nature of the goods. *Id.*

### III.   Defendant L&O's Motion for Summary Judgment

L&O contends that summary judgment is appropriate because, as a matter of law, Merchants cannot establish that the goods arrived at the final destination in a damaged or diminished condition. The parties agree that a carrier's liability for loss of goods extinguishes upon delivery. *See Republic Carloading & Distributing Co. v. Missouri Pac. R. Co.,* 302 F.2d 381, 386 (8th Cir. 1962). L&O contends that delivery was completed when Elmore left the container in Merchants' yard, and that the carrier's liability terminated at that time.[2] In making that argument, L&O relies heavily on *Eddie Bauer, Inc. v. Focus Transp. Services,* 881 F. Supp. 1174 (N. D. Ill. 1995) for the proposition that delivery is complete when the trailer is spotted in the yard. *Eddie Bauer*, however, is easily distinguishable on its facts.

In *Eddie Bauer*, on a Saturday, a driver for Gully Transportation "spotted" a trailer of Eddie Bauer goods at a trucking facility owned by Baker Motor Express ("Baker Motor").[3] Baker Motor was closed on Saturdays, and no representative was available to receive the shipment. Later that day, Baker Motor's Vice President and General Manager (VP/GM) arrived at Baker Motor's facility, checked the seal on the trailer, and tried unsuccessfully to call Gully and Central Ohio, the other shipping contractor who had subcontracted to Gully. Before leaving Baker Motor, the VP/GM placed a pinlock on the trailer to secure it from being moved. Sometime on Sunday, the trailer containing Eddie Bauer's merchandise was stolen from Baker

---

[2] As discussed below, L&O does not concede that it was the carrier for Carmack Amendment purposes.

[3] According to the *Eddie Bauer* court, "'spotting' a shipment means bringing a trailer up to a dock door, unhooking it from the tractor, and leaving the trailer at the facility." 881 F. Supp at 1176 n. 4.

Motor's terminal. *Id.* at 1177. Eddie Bauer filed suit against Baker Motor, Gully, and Central Ohio under the Carmack Amendment. *Id.*

In analyzing whether Central Ohio and Gully had completed "delivery" to Baker Motor, the court noted that, "at least a dozen times, Central Ohio shipments had been spotted and left at Baker Motor's facility when no Baker Motor employee was there." *Id.* at 1180. During those past dealings, when its crews arrived back to work, Baker Motor would check the seal on the container, locate the delivery bills, and unload the trailer. *Id.* Baker Motor did not ever reject those shipments or require anything additional from Central Ohio. The Court noted, "[t]here is no evidence, from either the bill of lading or the prior course of dealings between Central Ohio, Gully and Baker Motor, that Gully was required to perform anything beyond spotting the trailer to effectuate delivery." *Id.* In addition, the Court found that the Baker Motor VP/GM had "actually accepted responsibility for the shipment when he placed the pinlock on the trailer. By that action, Baker Motor prevented Gully or any honest party from asserting control over the shipment." *Id.* at 1181.

The facts of the instant case, while somewhat similar to the facts in *Eddie Bauer*, compel precisely the opposite result. In this case, Merchants and its employees did not take any action to accept responsibility for the shipment in question. In contrast, Elmore retained exclusive control over the shipment by virtue of placing his own kingpin lock on the container. Because Elmore alone had the key to that kingpin lock, Merchants was prevented from exercising any control over the shipment without further action by Elmore. Furthermore, unlike in *Eddie Bauer* where the course of dealing between the parties established that Gully retained no further responsibilities for delivery to be finalized, the parties' practice in this case did require further action by the driver. Elmore had to return to the facility during business hours to remove his

kingpin lock from the container and to present the contents for processing by Merchants' crew. On these facts, viewed in the light most favorable to Merchants, the court cannot conclude that delivery had occurred as a matter of law, because Elmore had to take additional steps to transfer custody and control over the shipment to Merchants.  L&O's motion for summary judgment is therefore denied.

## IV.   Merchants' Motion for Summary Judgment

Merchants contends that it is entitled to summary judgment because there is no genuine issue of material fact as to its establishment of a *prima facie* case under the Carmack Amendment, and because there is no genuine issue of material fact as to any of the applicable defenses.  L&O contests summary judgment on several different grounds.

### 1.   Merchants' standing as shipper

First, L&O challenges Merchants' standing to bring an action under the Carmack Amendment, because it identifies the shipper and owner of the container of salmon as Merchants' customer, TFC.  However, L&O concedes that a person who "by some lawful transaction has succeeded to the shipper's rights" has standing under the Carmack Amendment. *AIDA Dayton Technologies Corp. v. ITO Corp. of Baltimore*, 137 F.Supp.2d 637, 646 (D. Md. 2001) (*citing Bowden v. Philadelphia, B& W.R.,* 28 Del. 146, 91A. 206 (1914)); *see also Hansa Meyer Transport GmbH & Co., KG v. Norfolk Southern Ry. Co.*, 2008 WL 2168760 (D.S.C. May 20, 2008) ("The rights of action under the bill of lading may be properly assigned to another, who is then entitled to maintain the action against the rail carrier as the real party in interest.") (*citing Harrah v. Minnesota Min. and Mfg. Co.,* 809 F.Supp. 313, 318 (D.N.J. 1992)). L&O has not put forth any evidence to challenge the validity of the Settlement Agreement and Release (Halpert 9/18/2011 Aff. Exh. A), which evidences the assignment of all rights of action

8

from TFC to Merchants. As a result, even viewing the facts in the light most favorable to L&O, Merchants has standing to bring this claim.

### 2. L&O's role as carrier

L&O has raised a genuine issue of material fact with respect to the validity of the Owner/ Operator Agreement. That Agreement was signed by Otto Thompson on behalf of L&O in the presence of a Merchants' employee. (Draper Aff. Exh. A, Elmore Dep. at 18). Thompson has confirmed that the signature on the agreement is his. (Parker Aff. Exh. B). In the fall of 2008, Thompson served as the operations manager of L&O and was one of the incorporators of that company. (Van Der Meulen Aff. Exh. A, Skeen Aff. Exh. A). Thompson provided Merchants with a "Certificate of Liability Insurance" listing L&O as the insured and Merchants as the certificate holder. (Draper Aff. at 2, Exh. B). However, the affidavit of Shane Sanders, the current Office Manager of L&O, asserts that, "Otto Thompson was never authorized to sign the purported Owner/Operator agreement with on behalf of L & O Transport, Inc." (Sanders Aff. at 5). Sanders's affidavit is consistent with L&O's interrogatory responses, which also deny any owner/operator relationship between L&O and Elmore.[4] (L&O's Mot. for Summ. Judgment Exh. 2). Moreover, Elmore's testimony makes clear that his only dealings were with Thompson and that his monetary transactions with L&O consisted solely of cash transactions with Thompson. (Elmore Dep. at 77-78). Those facts would be consistent with L&O's theory of a rogue employee acting for his personal benefit. In evaluating a motion for summary judgment, L&O's evidence is to be believed, and all justifiable inferences are to be drawn in its favor. *See*

---

[4] It appears that both Sanders's affidavit and the L&O Interrogatory responses may contradict information that Sanders provided to an investigator hired by Merchants. (Parker 9/13/2011 Aff. Exh. A). While those unsworn statements to the investigator may impact a factfinder's eventual assessment of the credibility of Sanders's current position, credibility determinations are not appropriate at the summary judgment stage. *See Anderson*, 477 U.S. at 255.

*Anderson*, 477 U.S. at 255. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences" are inappropriate in ruling on a motion for summary judgment. *See id.* If L&O's evidence is believed and all inferences are drawn in its favor, a genuine issue of material fact exists as to the validity of the Owner/Operator Agreement.

Merchants contends that the doctrine of apparent authority would render the Owner/Operator Agreement binding. "Apparent authority results from certain acts or manifestations by the alleged principal to a third party leading the third party to believe that an agent had authority to act." *Klein v. Weiss,* 284 Md. 36, 61 (1978). In this case, the only acts or manifestations by L&O to Merchants came from Thompson, the agent with whom Elmore and Merchants were dealing. Maryland courts have cautioned that, "[i]t is nearly axiomatic that one dealing with an agent must use reasonable diligence and prudence to ascertain whether the agent acts within the scope of his powers." *Dickerson v. Longoria*, 414 Md. 419, 442 (2010) (*citing P. Flanigan & Sons v. Childs*, 251 Md. 646, 654 (1968)). Given the questions surrounding Thompson's authority, and the lack of any other acts or manifestations to Merchants by L&O, there also exists a genuine issue of material fact as to the applicability of the doctrine of apparent authority. As a result, Merchants' motion for summary judgment must be denied.[5]

---

[5] In light of this denial, the court will not address L&O's other arguments opposing summary judgment.

**Conclusion**

For the reasons set forth above, Defendant's Motion for Summary Judgment is denied. Plaintiff's Motion for Summary Judgment is also denied. A separate order effectuating the rulings made in this memorandum is being entered herewith.


Dated:  September 29, 2011                             /s/
                                                Stephanie A. Gallagher
                                                United States Magistrate Judge