## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MERCHANTS TERMINAL CORP.,      \*

                      \*

        Plaintiff,       \*

                      \*

      v.              \*      Case No. SAG-09-cv-2065

                      \*

L&O TRANSPORT, INC.,       \*

                      \*

        Defendant.     \*

\*\*\*\*\*\*

## MEMORANDUM OF DECISION

In October 2008, Merchants Terminal Corporation ("Merchants") hired Charles Elmore to drive a truckload of frozen salmon from Merchants' Delaware warehouse to the company's Baltimore facility. Elmore picked up a container full of fish on October 22, 2008, and dropped it at Merchants' Baltimore warehouse in the middle of the night. By the morning of October 23, 2008, the container – along with the 2,200 cartons of frozen salmon therein – had disappeared.

Merchants (now known as MTC Logistics) sued Elmore for negligence. (Am. Compl. ¶¶ 10-14, ECF No. 22.) Merchants also sued Defendant L&O Transport, Inc. ("L&O"), the transportation company under whose authority Elmore operated, pursuant to the Carmack Amendment to the Interstate Commerce Act ("the Amendment" or "the Carmack Amendment"). (Am. Compl. ¶¶ 5-9, ECF No. 22.) This Court dismissed Elmore as a defendant, (ECF No. 44), but Elmore remains in this case because L&O has filed a cross-claim against him for indemnification. (ECF No. 30). A bench trial was held on March 6 and 7, 2012. The Court has heard the evidence, reviewed the exhibits, considered the materials submitted by the parties, and had the benefit of the arguments of counsel. The Court now issues this Memorandum of Decision

as its findings of fact and conclusions of law in compliance with Rule 52(a) of the Federal Rules of Civil Procedure.

For the following reasons, the Court finds L&O liable under the Carmack Amendment and awards Merchants $57,559.00 plus prejudgment interest. The Court further finds that Elmore owes indemnity to L&O.

## I.    Findings of Fact

The Court finds the facts stated herein based upon its evaluation of the evidence, including the credibility of witnesses, and the inferences that the Court has found reasonable to draw from the evidence.

1. Merchants is a public cold storage warehousing business. The company warehouses its customers' refrigerated or frozen goods before the goods are sent to retail stores and distribution centers. Though Merchants does not itself provide transportation services, it frequently arranges transportation for its customers' goods both to and from Merchants' warehouses. (Test. of Harry Halpert, March 6, 2012.)

2. The truck drivers that Merchants hires to transport its customers' products must be properly licensed and insured.  Truck drivers hired by Merchants must be authorized to access the Port of Baltimore ("the Port"); must carry general liability insurance, cargo liability insurance, and automotive insurance; and must be registered to operate in interstate commerce with the U.S. Department of Transportation. (Halpert Test., March 6, 2012; Test. of Bonita Draper, March 6, 2012.)

3. Since at least 2004, Merchants hired Elmore, a truck driver and an owner of two truck rigs, to pick up and deliver shipments of Merchants' customers' goods. (Halpert Test., March 6, 2012; Draper Test, March 6, 2012; Test. of Charles Elmore, March 6, 2012.)

4. Elmore occasionally employed truck drivers Arnold Gadsden and Richard Arlee to drive Elmore's truck rigs. (Elmore Test., March 6, 2012; Test. of Shane Sanders, March 6, 2012; Test. of Richard Arlee, March 6, 2012.)

5. Elmore did not have the authority to operate in interstate commerce or to access the Port. In order to pick up and deliver containers at the Port, and to drive shipments interstate, Elmore needed to associate with a carrier that had (i) sufficient insurance; (ii) authority to access the Port; and (iii) federal registration to carry goods shipped in interstate commerce. (Halpert Test., March 6, 2012; Elmore Test., March 6, 2012; Draper Test., March 6, 2012.)

6. L&O is a transportation company that operates as a carrier for intrastate and interstate shipments. L&O carries insurance to operate as an interstate carrier, is registered with the U.S. Department of Transportation, and has an interchange agreement with the Port that enables L&O-approved drivers to pick up and deliver containers at the Port. (Test. of Laurine Sanders, March 6, 2012; Joint Exhs. 7, 17.)

7. In July 2008, Otto Thompson was an L&O employee with authority to bind the company. (Draper Test, March 6, 2012; Elmore Test., March 6, 2012.)[1]

8. On July 15, 2008, Elmore and Thompson signed an Owner Operator Lease Agreement ("the Agreement") in the presence of Bonita Draper, Merchants' customer service

---

[1] Shane Sanders, L&O's office manager, and Laurine Sanders, L&O's president, testified that Otto Thompson was never L&O's "direct employee" and that Thompson never had authority to bind L&O. (S. Sanders Test., March 6, 2012; L. Sanders Test., March 6, 2012.) However, Mr. Sanders and Ms. Sanders also testified that Thompson, on L&O's behalf, sometimes picked up containers at the Port, drove trucks, got fuel, and dropped off paperwork. (S. Sanders Test., March 6, 2012; L. Sanders Test., March 6, 2012.) In addition, two other witnesses testified that Thompson represented himself as a co-owner of L&O, and the Castle Security Group investigators' reports reflect that Thompson, Ms. Sanders, and Mr. Sanders all identified Thompson as an L&O office manager. (Draper Test., March 6, 2012; Elmore Test., March 6, 2012; Joint Ex. 6.) Furthermore, the evidence shows that Thompson provided contact information for Ms. Sanders, Mr. Sanders, and L&O's main office when he signed the Owner Operator Lease Agreement with Charles Elmore on L&O's behalf. (Draper Test., March 6, 2012; Joint Exh. 19.) This is not the behavior of a rogue employee who is acting without authority of his employer. For these reasons, the Court finds that Thompson was an L&O employee who had authority to bind the company. The Court discounts the contrary testimony of Ms. Sanders and Mr. Sanders as not credible.

manager. (Joint Exh. 1 at 1; Joint Exh. 6 at 13; Elmore Test., March 6, 2012; Draper Test., March 6, 2012.)

9.  The Agreement created a contractual relationship between L&O and Elmore. (Joint Exh. 1 at 1.)

10. The Agreement inaccurately listed L&O's corporate title as L&O Transport, LLC. (*Id.*)

11. Under the Agreement, L&O allowed Elmore and his drivers to operate under L&O's insurance, interstate shipping authority, and interchange agreement with the Port. (Joint Exh. 1 at ¶ 7; Elmore Test., March 6, 2012.)

12. Under the Agreement, Elmore leased the use of his truck rigs to L&O in exchange for payments "agreed by the Parties for the lease period." (Joint Exh. 1, ¶¶ 1, 11.)

13. Elmore paid L&O ten percent of his earnings from the jobs he undertook for Merchants. (Elmore Test., March 6, 2012; Joint Exh. 6 at 5, 13.)

14. The Agreement defines "Contractor" as Elmore, and "Carrier" as L&O. The Agreement includes clauses that state:

> 6. Claims: **Contractor agrees to reimburse Carrier for all amounts which Carrier pays to third parties in settlement of any claims for loss or damage to persons or property occurring during, arising out of, or occasioned by Contractor's services to Carrier or to any equipment or property while in the custody of Contractor or its personnel.** Contractor warrants and represents that it shall make no claim against Carrier for any liability or responsibility for any damage to Contractor's equipment or property.
>
> 10. General Indemnity: **Contractor agrees to indemnify, defend and hold Carrier harmless from any loss, expense of [sic] claim including attorney fees against Carrier for any type of injury of [sic] damage to any person of [sic] property** including Contractor, its employees of [sic] agents **as a result of any act or failure to act by Contractor, its employees or agents arising out of or occasioned by the services provided by Contractor to Carrier under this Agreement.**

(Joint Exh. 1 at ¶¶ 6, 10 (emphasis added).)

15. When Elmore and Thompson signed the Agreement on July 15, 2008, Thompson provided Draper with a copy of L&O's certificate of insurance, with Merchants listed as a holder of the certificate. L&O's insurance company also faxed a copy of this document to Draper on July 16, 2008. (Draper Test., March 6, 2012; Joint Exh. 7.)

16. On July 15, 2008, Thompson also showed Draper a copy of L&O's U.S. Department of Transportation registration, which authorizes L&O to operate as an interstate carrier. (Draper Test., March 6, 2012; Joint Exh. 17.)

17. On July 15, 2008, Thompson gave Draper contact information for L&O's president, Laurine Sanders, and L&O's office manager, Shane Sanders. Thompson told Draper that she could contact either of these L&O representatives if needed.  (Draper Test., March 6, 2012; Joint Exh. 19.)

18. The contact information Thompson provided included accurate telephone numbers for Ms. Sanders and Mr. Sanders. (L. Sanders Test., March 6, 2012; Joint Exh. 19.)

19. Merchants paid Elmore by check for any work that Elmore did for Merchants. Elmore in turn paid ten percent of his Merchants earnings in cash to Thompson. (Elmore Test., March 6, 2012; Draper Test., March 6, 2012; Joint Exh. 6 at 4-5.)

20.  L&O never enabled Elmore to access containers at the Port under L&O's authority. However, L&O did enable Arlee and Gadsden – Elmore's drivers – to access containers at the Port under L&O's authority. (Elmore Test., March 6, 2012; S. Sanders Test., March 6, 2012.)

21. Sometime on or before October 20, 2008, Merchants directed Elmore to pick up two containers of frozen seafood at the Port and to deliver them to a Merchants-owned

warehouse in Delaware ("the Delaware warehouse"). (Halpert Test., March 6, 2012; Elmore Test., March 6, 2012; Draper Test., March 6, 2012.)

22. On the morning of October 20, 2008, Shane Sanders searched the eModal database run by the Port. The eModal database includes, among other information, the names of drivers who are allowed to access the Port under a particular carrier's authority. Both Arlee and Gadsden were listed as drivers who were enabled to access the Port under L&O's authority. (S. Sanders Test., March 6, 2012.)

23. Using the eModal system, Shane Sanders revoked Arlee's and Gadsden's authority to access the Port on behalf of L&O. This revocation was effective on October 20, 2008 at 10:14 A.M. (S. Sanders Test., March 6, 2012; Elmore Test., March 6, 2012; Joint Exh. 14.)

24. Though Shane Sanders revoked Arlee's and Gadsden's authority to access the Port at 10:14 A.M. on October 20, 2008, the Port nevertheless allowed Arlee to pick up two containers under L&O's authority that same morning. (S. Sanders Test., March 6, 2012; Joint Exh. 3.)

25. Arlee entered the Port at 9:30 A.M. on October 20, 2008, and exited the Port with container EMCU5205253 and a second container at around 10:35 A.M. on October 20, 2008. (S. Sanders Test., March 6, 2012; Joint Exh. 3.)

26. The containers that Arlee picked up on October 20, 2008 contained frozen seafood owned by The Fishin' Company, one of Merchants' customers. (Halpert Test., March 6, 2012; Draper Test., March 6, 2012.)

27. Arlee and Elmore drove container EMCU5205253 and the second container from the Port to the Delaware warehouse on October 20, 2008. Merchants accepted delivery of the

frozen seafood shipped in both containers. (Halpert Test., March 6, 2012; Elmore Test., March 6, 2012.)

28. In order to have enough product in Baltimore to ship out to The Fishin' Company's retail customers, Merchants decided to reuse container EMCU5205253 and the second container to move some of The Fishin' Company's frozen salmon from the Delaware warehouse to Merchants' warehouse located at 501 N. Kresson Street, Baltimore, Maryland 21224 ("the Kresson Street warehouse"). (Halpert Test., March 6, 2012; Draper Test., March 6, 2012.)

29. Employees at the Delaware warehouse loaded the two empty containers with frozen salmon, checked the interior temperature of the containers, prepared bills of lading, placed the appropriate bill of lading in each container, and then sealed each container with a Merchants seal. (Halpert Test., March 6, 2012; Joint Exh. 2.)

30. Before sealing the containers, Merchants employees confirmed that the goods were in good condition, that is, that none of the boxes containing the frozen salmon were stained, iced over, or misshapen. (*See* Halpert Test., March 6, 2012.)

31. Merchants employees noted the interior temperature of container EMCU5205253 on its bill of lading, and directed the driver to maintain the internal temperature of -11° Fahrenheit. (Halpert Test., March 6, 2012; Joint Exh. 2.)

32. Arlee and Elmore picked up container EMCU5205253 and the second container at the Delaware warehouse on October 22, 2008. (Elmore Test., March 6, 2012; Arlee Test., March 6, 2012; S. Sanders Test., March 6, 2012.)

33. Merchants instructed Elmore and Arlee to deliver the two sealed containers of frozen salmon to the Kresson Street warehouse by the early morning hours of October 23, 2008. (Elmore Test., March 6, 2012; Draper Test., March 6, 2012.)

34. In September 2009, Merchants closed the Kresson Street warehouse. However, the Kresson Street warehouse was in use throughout 2008. (Halpert Test., March 6, 2012.)

35. The Kresson Street warehouse facility included a large, open-air loading dock that abutted a truck yard. (Joint Exh. 15; Halpert Test., March 6, 2012.)

36. Lights on the ceiling of the Kresson Street loading dock may have somewhat illuminated the truck yard, but no lights specifically lit the truck yard area. (Joint Exh. 15; Halpert Test., March 6, 2012.)

37. The loading dock and truck yard were surrounded by a chain link fence. The fence was seven or eight feet tall. A gate in the fence allowed vehicles to access the truck yard from Kresson Street; that gate was secured at night with a chain lock. (Joint Exh. 15; Halpert Test., March 6, 2012; Draper Test., March 6, 2012.)

38. Although Merchants used video surveillance at some of its other facilities, Merchants did not use video cameras to monitor the loading dock or truck yard areas of the Kresson Street warehouse. (Joint Exh. 15; Halpert Test., March 6, 2012; Draper Test., March 6, 2012.)

39. The Kresson Street warehouse and loading dock were not open 24 hours per day. (Halpert Test., March 6, 2012; Draper Test., March 6, 2012; Elmore Test., March 6, 2012.)

40. For the convenience of both truck drivers and Merchants, Merchants allowed trusted drivers to drop off containers to the Kresson Street warehouse at times when the facility

was not open for business. Merchants provided those drivers with a key to the chain lock that secured the truck yard gate. By using the gate key, drivers could enter the truck yard and loading dock area when no Merchants employees were on duty. (Halpert Test., March 6, 2012; Draper Test., March 6, 2012; Elmore Test., March 6, 2012.)

41. Drivers making after-hours "drops" were expected to drop off their containers in accordance with security measures determined by Merchants, and to return as needed to complete the process of delivering the goods to Merchants employees. (Halpert Test., March 6, 2012; Draper Test., March 6, 2012; Elmore Test., March 6, 2012.)

42. To complete the receiving process, Merchants employees compare the driver's paperwork with the paperwork on file for a particular shipment, ask the driver to position the container for unloading at the loading dock, break the seal on the shipment, inspect the goods, and unload the goods from the container. (Halpert Test., March 6, 2012; Draper Test., March 6, 2012; Elmore Test., March 6, 2012.)

43. Security measures for after-hours drops included positioning containers against the loading dock so that they could not be opened, and locking the gate to the truck yard upon departure. (Halpert Test., March 6, 2012; Draper Test., March 6, 2012; Elmore Test., March 6, 2012.)

44. After a container of frozen food was stolen from the Kresson Street warehouse yard one night in July 2008, Merchants asked drivers making after-hours drops to take the additional step of securing containers with kingpin locks. (Halpert Test., March 6, 2012; Elmore Test., March 6, 2012.)

45. Kingpin locks are designed to prevent unauthorized drivers from securing a locked container to a rig. Kingpin locks are locked and unlocked with keys. Once a kingpin lock

has been secured to a container, that container can only be moved after the lock has been removed. (Halpert Test., March 6, 2012.)

46. Elmore and Arlee drove container EMCU5205253 and the second, re-loaded container from the Delaware warehouse to the Kresson Street warehouse without incident, arriving around 12:30 A.M. on October 23, 2008. (Arlee Test., March 6, 2012; Elmore Test., March 6, 2012.)

47. Elmore opened the gate to the Kresson Street truck yard, using a key that a Merchants employee had given him. Elmore and Arlee left the containers in the position that Merchants had instructed, with the doors of the containers directly against the wall of the loading dock. Elmore and Arlee further secured the containers by placing Elmore's own kingpin locks on the containers. (Arlee Test., March 6, 2012; Elmore Test., March 6, 2012.)

48. Elmore retained the keys to the kingpin locks on his person. (Elmore Test., March 6, 2012.)

49. Arlee and Elmore left the Kresson Street truck yard after they finished securing the containers. Elmore locked the gate after he and Arlee exited the Kresson Street truck yard. (Arlee Test., March 6, 2012; Elmore Test., March 6, 2012.)

50. Elmore and Arlee next drove to Jessup to pick up two empty containers from another Merchants warehouse, then returned to Baltimore with those empty containers. They stored those empty containers temporarily at a lot owned by L&O. (Elmore Test., March 6, 2012.)

51. Elmore next drove his rig back to the Kresson Street warehouse and parked on the street near the gate to the truck yard. Elmore arrived at Kresson Street at about 5:30 A.M. on October 23, 2008. Upon his arrival, Elmore went to sleep. (Elmore Test., March 6, 2012.)

52. Elmore expected to sleep until about 7:30 A.M. on October 23, 2008, at which time he planned to re-enter the Kresson Street truck yard, remove his kingpin locks from the two containers that he and Arlee had delivered, and work with Merchants employees to complete the paperwork for the two containers. (Elmore Test., March 6, 2012.)

53. Instead, Merchants' loading dock manager awakened Elmore at about 6:00 A.M. on October 23, 2008. The loading dock manager informed Elmore that the lock to the gate had been cut and that container EMCU5205253 was missing. (Elmore Test., March 6, 2012.)

54. Upon discovering that container EMCU5205253 had been stolen, Merchants notified its client, The Fishin' Company, that a container holding 2,200 cartons of The Fishin' Company's frozen salmon had been stolen from the Kresson Street warehouse loading dock. (Halpert Test., March 6, 2012.)

55. After some negotiation, Merchants paid The Fishin' Company $63,184.00 – the agreed-upon value of the stolen salmon – in exchange for all rights and claims related to the stolen salmon. (Joint Exhs. 4, 8; Halpert Test., March 6, 2012.)

56. Merchants did not submit a claim to its insurance company for the value of the stolen salmon. (Halpert Test., March 6, 2012.)

57. Merchants hired the Castle Security Group to investigate the theft of the salmon. Castle Security Group's investigators interviewed a number of people and rendered several

reports in connection with their investigation. (Joint Exh. 6; Halpert Test., March 6, 2012.)

58. Merchants paid the Castle Security Group $9,849.18 for their services rendered. (Joint Exh. 9; Halpert Test., March 6, 2012.)

59. On November 17, 2008, container EMCU5205253 was recovered. Of the 2,200 cartons of frozen salmon originally shipped in container EMCU5205253, 2,118 cartons remained intact. (Halpert Test., March 6, 2012; Draper Test., March 6, 2012; Joint Exh. 8.)

60. Because the salmon appeared to still be frozen at the time of its recovery, Merchants had samples of the product tested for freshness. These tests cost $729.00 and revealed that the salmon was still saleable. (Joint Exh. 10; Halpert Test., March 6, 2012.)

61. From November 2008 through April 9, 2010, Merchants stored the salmon in one of its warehouses while it attempted to find a salvage buyer for the frozen salmon. (Joint Exh. 11; Halpert Test., March 6, 2012.)

62. Using handling and storage rates that Merchants used for The Fishin' Company's products, Merchants determined that it had spent $2,711.65 in storage charges for the salmon. (Joint Exh. 11; Halpert Test., March 6, 2012.)

63. Merchants sold the frozen salmon to a salvager on March 20, 2010, roughly 16 months after the salmon was recovered. The salvager paid Merchants $6,354.00 for the salmon. Merchants shipped the salmon to the salvager on April 9, 2010. (Joint Exh. 13; Halpert Test., March 6, 2012.)

## II.    Conclusions of Law

Merchants asserted that L&O is liable for any damages stemming from the theft of the frozen salmon because the Carmack Amendment, 49 U.S.C. § 14706 *et seq.* (2011), imposes

something akin to strict liability upon carriers operating in interstate commerce. *See Rankin v. Allstate Ins. Co.*, 336 F.3d 8, 9 (1st Cir. 2003). L&O countered with several alternative arguments. L&O first asserted that it could not be considered a carrier under the Amendment because the Owner Operator Lease Agreement was fraudulently executed by someone who did not have authority to bind L&O. Second, L&O contended that delivery to Merchants had been completed before the salmon was stolen, and therefore that the Amendment's liability provisions do not apply. L&O next argued that it could not be held liable under the Amendment because the theft of the salmon was caused by Merchants' negligent failure to secure the premises of the Kresson Street warehouse. Finally, L&O argued that if it could be held liable under the Amendment, then Elmore owes L&O indemnity under the terms of the Agreement. Elmore echoed many of L&O's arguments, but added that he could not be liable to L&O because he did not act negligently in his delivery of the salmon. Elmore also suggested that he temporarily bailed the salmon to Merchants for safe-keeping by leaving the container in Merchants' truck yard, and, therefore, that Merchants was liable for negligence as a bailee. Elmore further reasoned that Merchants failed to properly mitigate its damages by failing to file an insurance claim for the value of the stolen salmon. For the reasons described below, the defenses L&O and Elmore raise are unavailing.

### A.  L&O Is Liable to Merchants Under the Carmack Amendment.

L&O qualifies as a carrier under the Carmack Amendment, and has failed to rebut the statutory presumption of carrier liability. The Amendment provides shippers with the right to sue carriers for damage or diminishment to goods during transport. 49 U.S.C. § 14706(a)(1). A carrier is "a person providing motor vehicle transportation for compensation." 49 U.S.C. §§ 13102(3), (14) (2011). If a shipper states a *prima facie* case under the Amendment, a

presumption of negligence on the part of the carrier arises. The elements of a *prima facie* case include (1) delivery of the cargo in good condition to the carrier, (2) arrival in short or damaged condition, and (3) the amount of damages. *Missouri Pac. R.R. Co. v. Elmore & Stahl,* 377 U.S. 134, 137–38 (1964). The amount of damages to which a shipper is entitled under the Amendment is "the actual loss or injury to the property caused by (A) the receiving carrier, (B) the delivering carrier, or (C) another carrier . . . ." 49 U.S.C. § 14706(a)(1). If the shipper successfully establishes a *prima facie* case, the burden shifts to the carrier to establish (1) that it was free from negligence and (2) that the damage to the cargo was due to one of several excepted causes: an act of God, the public enemy, the act of the shipper himself, public authority, or the inherent vice or nature of the goods. *Id.*

### a.   Merchants is a Shipper for Purposes of Carmack Amendment Analysis.

L&O concedes that a person who "by some lawful transaction has succeeded to the shipper's rights" has standing as a shipper under the Amendment. *AIDA Dayton Technologies Corp. v. ITO Corp. of Baltimore,* 137 F.Supp.2d 637, 646 (D.Md.2001) (*citing Bowden v. Philadelphia, B & W.R.,* 28 Del. 146, 91A. 206 (1914)); *see also Hansa Meyer Transport GmbH & Co., KG v. Norfolk Southern Ry. Co.,* Civil Action No. 8:06-cv-00924, 2008 WL 2168760 at *7 (D.S.C. May 20, 2008) ("The rights of action under the bill of lading may be properly assigned to another, who is then entitled to maintain the action against the rail carrier as the real party in interest.") (*citing Harrah v. Minnesota Min. and Mfg. Co.,* 809 F.Supp. 313, 318 (D.N.J. 1992)). The parties agree that, as a result of the settlement agreement between Merchants and its client, Merchants has assumed rights initially held by The Fishin' Company, the original shipper of the stolen salmon. (*See* Joint Exhs. 4 and 8.) The rights assumed by Merchants include the right to sue under the Amendment for non-delivery of goods carried interstate.

### b.  L&O is a Carrier Under the Carmack Amendment.

L&O argued that it was not a carrier of the stolen salmon. Specifically, L&O claimed that Otto Thompson, the man who signed the Agreement on L&O's behalf, had no authority to bind the transport company.[2] Because Thompson had no authority to bind L&O, L&O reasoned that the Agreement was invalid and that L&O could not possibly be held liable under the Amendment. This argument fails in the face of evidence that shows that Thompson was an L&O employee and that the Agreement between L&O and Elmore is a valid contract.

A contract is an agreement which creates an obligation; such an agreement may be defined as the concurrence of two or more persons in a common intent to affect their legal relations. *Post v. Gillespie*, 219 Md. 378, 384 (1959). A contract exists where there is "mutual assent (offer and acceptance), an agreement definite in its terms, and sufficient consideration." *CTI/DC, Inc. v. Selective Ins. Co. of Am.*, 392 F.3d 114, 123 (4th Cir. 2004). Indeed, "[a] manifestation of mutual assent by the parties to a contract is essential to its formation." *Gillespie*, 219 Md. at 384.

L&O did not dispute that the Agreement's terms are definite and the consideration offered was sufficient for the Agreement to be considered a valid contract. Rather, L&O focused on the element of mutual assent, asserting that L&O had no knowledge of the Agreement and had never assented to it. Elmore's assent was undisputed at trial. (*See* Draper Test., March 6, 2012; Elmore Test., March 6, 2012.).

---

[2] L&O also questioned the authenticity of Otto Thompson's signature on the Agreement. Ms. Sanders and Mr. Sanders both testified that the signature on the Agreement did not look like Thompson's actual signature. (L. Sanders Test., March 6, 2012; S. Sanders Test., March 6, 2012.) The Court does not consider this testimony to be credible when viewed in conjunction with other evidence in the record, *i.e.*, the testimony of two witnesses who watched Thompson sign the Agreement and the Castle Security Group investigator's report that reflects that Thompson admitted that the signature on the Agreement was his. (*See* Draper Test., March 6, 2012; Elmore Test., March 6, 2012; Joint Ex. 6 at 13.)

The Court has already found that Thompson was an L&O employee, for the reasons discussed in footnote 1 of this opinion. The evidence also indicates that L&O was aware of the Agreement's existence. L&O's insurance company faxed a certificate of insurance to Merchants on the day after the Agreement was signed. (Joint Exh. 7.) The certificate of insurance lists Merchants as the certificate holder, *id.*, and could only have been sent to Merchants at the direction of an authorized L&O employee. In addition, contact information for L&O's president and office manager is noted on the back of the Agreement. (Joint Exh. 19.) Bonita Draper testified that Thompson gave her these phone numbers, as well as his own, at the time the Agreement was signed so that she could contact L&O as needed. (Draper Test., March 6, 2012.) Finally, L&O manifested assent to the Agreement by acting in accordance with the Agreement's terms. Shane Sanders, Laurine Sanders and Thompson all explained to investigators that Elmore worked for L&O.[3] (Joint Exh. 6 at 1, 4-5.) Mr. Sanders and Thompson explained that Elmore paid L&O a certain sum of money for the privilege of pulling containers at the Port under L&O's authority. (Joint Exh. 6 at 4-5, 9.) Elmore also testified that he paid L&O ten percent of his earnings from jobs he undertook for Merchants. (Elmore Test., March 6, 2012.) L&O added Elmore's drivers to its list of drivers approved to pick up containers at the Port on L&O's behalf. (S. Sanders Test., March 6, 2012.) This evidence all demonstrates L&O's assent to the terms of the Agreement.

For the foregoing reasons, the Court finds that the Agreement is a valid contract between L&O and Elmore. Per the Agreement's terms, Elmore leased his trucks to L&O and provided drivers for those trucks in exchange for the privilege of operating under L&O's insurance and

---

[3] In a later interview by a Castle Security Group investigator, Shane Sanders claimed that L&O did not have an owner/operator agreement with Elmore. Rather, Mr. Sanders asserted that L&O simply allowed Elmore and his drivers to pick up containers at the Port under L&O's authority. (Joint Exh. 6 at 9.) Mr. Sanders made this same assertion at trial. (S. Sanders Test., March 6, 2012.) The Court does not find these assertions credible when viewed in light of the other evidence.

L&O's authority to access the Port.[4] (*See* Joint Exh. 1 at ¶¶ 1, 4, 12.) In return for the privilege of operating under L&O's authority, Elmore paid L&O's employee, Thompson, a percentage of the payments he received from Merchants. (Elmore Test., March 6, 2012; Joint Exh. 6 at 1-2, 4-5; *see also* L. Sanders Test., March 6, 2012.)

As noted above, a carrier is "a person providing motor vehicle transportation for compensation." 49 U.S.C. §§ 13102(3), (14).  Because the Agreement provides that L&O is a lessor of Elmore's trucks and his drivers' services, because Elmore was able to operate interstate and at the Port under L&O's authority, and because L&O received a percentage of Merchants' payments to Elmore, L&O qualifies as a carrier under the Carmack Amendment.

L&O contends that even if the Agreement was binding, it was terminated on the morning of October 20, 2008 when Shane Sanders removed Elmore's two drivers from the roster of drivers that L&O had authorized to access the port. (S. Sanders Test, March 6, 2012). However, there is no evidence that L&O notified Merchants of this development. Indeed, Merchants had no reason to believe that Elmore's relationship with L&O had changed.

Although Elmore was not technically an "agent" of L&O, the equitable principles underlying the doctrine of apparent authority are directly analogous to this case. Under that doctrine, "a principal will be bound by the acts of a person purporting to act for him where 'the words or conduct of the principal cause a third party to believe that the principal consents to or has authorized the conduct of the agent.'" *Adams v. Brooks,* Docket No. DKC-2005-cv-3332, 2007 WL 5745937 at *12 (D. Md. July 25, 2007) (*quoting Johns Hopkins Univ. v. Ritter*, 689 A.2d 91, 100 (Md. Ct. Spec. App. 1996)).  Once apparent authority exists, to avoid being bound by further actions of the agent, the principal has an obligation to notify the third party of any

---

[4] Without L&O's approval, Elmore would not have been able to pick up and deliver containers to the Port. Elmore also would have been unable to drive goods interstate legally.

termination of the relationship.  *See, e.g., Veydt v. Lincoln Nat. Life Ins. Co.*, 614 A.2d 1318, 1322-23 (Md. Ct. Spec. App. 1992) (determining that an agent with whom a life insurance company had severed ties still had apparent authority to bind the life insurance company until the company notified policyholders of the change in the agent's status). L&O's actions, taken by Thompson, caused Merchants to believe that L&O authorized and provided insurance for the operation of Elmore's tractors. Merchants relied on that continuing relationship between Elmore and L&O when it hired Elmore to drive container EMCU5205253 from Delaware to Maryland on October 22, 2008. L&O had done nothing to advise Merchants that the Agreement had been terminated. As a result, L&O remained the carrier under whose authority Elmore operated during his trip for Merchants on October 22, 2008.

### c.  Merchants Has Proved its *Prima Facie* Case Under the Carmack Amendment.

To prove a *prima facie* case of liability under the Amendment, a shipper must show: (1) delivery of the cargo in good condition to the carrier; (2) arrival in short or damaged condition; and (3) the amount of damages. *Missouri Pac. R.R. Co. v. Elmore & Stahl,* 377 U.S. 134, 137–38 (1964). Merchants has sufficiently demonstrated all elements of its *prima facie* case.

### i.  The Frozen Salmon Was Delivered to L&O in Good Condition.

Harry Halpert, Merchants' president, testified that the 2,200 cartons of frozen salmon loaded into container EMCU5205253 on October 22, 2008 were inspected for stains, ice, and other irregularities. (Halpert Test., March 6, 2012.) Halpert further testified that the temperature of the container was -11° Fahrenheit at the time the container was loaded. (Halpert Test., March 6, 2012.) The bill of lading included instructions to maintain the container's temperature at -11° Fahrenheit. (Joint Exh. 2.) None of this evidence was disputed, and it suffices to show that the salmon was delivered to L&O and Elmore in good condition.

### ii.  L&O Did Not Complete Delivery of the Salmon to Merchants.

L&O asserted that it cannot be subject to Carmack Amendment liability because delivery was completed before the salmon was stolen. As with L&O's other arguments related to the applicability of the Amendment's liability provisions, this argument fails.

The parties agree that a carrier's liability for loss of goods extinguishes upon delivery. *See Republic Carloading & Distrib. Co. v. Missouri Pac. R. Co.,* 302 F.2d 381, 386 (8th Cir. 1962). Delivery generally "occurs when one party surrenders – and the other party accepts – possession, custody, and control of the goods involved." *Electro Source, Inc. v. United Parcel Serv., Inc.*, 95 F.3d 837, 839 (9th Cir. 1996) (quoting *Tokio Marine & Fire Ins. Co. v. Amato Motors, Inc.,* 871 F.Supp. 1010, 1014 (N.D.Ill.1994)).

The undisputed evidence is that Elmore and Arlee drove both containers into the truck yard at 501 N. Kresson Street, secured the containers per Merchants' instructions, and left the containers there. (Arlee Test., March 6, 2012; Elmore Test., March 6, 2012.) Elmore and Arlee placed the containers against the loading dock so that the goods inside the containers were inaccessible. (*Id.*) Elmore and Arlee also secured both containers with Elmore's kingpin locks. (Arlee Test., March 6, 2012; Elmore Test., March 6, 2012.)

These actions alone cannot constitute delivery. L&O, the carrier, had not surrendered the goods to Merchants' possession, custody, and control because container EMCU5205253 and the other container were secured with kingpin locks for which Elmore had the only key. Short of destroying the kingpin locks or the containers themselves, the only way to access the salmon inside the containers was for Elmore to unlock the kingpin locks with his key. Until Elmore gave Merchants employees access to the frozen salmon, L&O had not surrendered possession of the frozen salmon.

It is also true that Merchants had not accepted possession, custody, and control of the goods before the theft of container EMCU5205253 occurred. Merchants accepted delivery of shipments only after breaking the seal on a particular shipment, inspecting the goods, and comparing the driver's paperwork with the paperwork on file at Merchants. (Halpert Test., March 6, 2012; Draper Test., March 6, 2012; *see also* Elmore Test., March 6, 2012.)

Dropping the container at Merchants' loading dock was not enough to constitute delivery of the salmon because possession, custody, and control of the goods were not fully transferred to Merchants. Delivery to Merchants, therefore, had not been completed at the time that the salmon was stolen.

### iii. Merchants Demonstrated Damages "Due to the Actual Loss or Injury to the Property" in the Amount of $57,559.00.

At trial, Merchants submitted receipts reflecting its expenses associated with the theft of container EMCU5205253, including the expenses it incurred in the investigation of the theft, the storage of the recovered salmon, and the lab testing of the salmon. Not all of these expenses can be properly considered Merchants' damages.

As noted above, the liability imposed on a carrier by the Carmack Amendment is "for 'the actual loss or injury to the property,' not necessarily for the financial burden on the complainant." *5K Logistics, Inc. v. Daily Exp., Inc.*, 659 F.3d 331, 336 (4th Cir. 2011) (relying on 49 U.S.C. § 14706(a)(1)); *see also Oak Hall Cap & Gown, Inc. v. Old Dominion Freight Line, Inc.*, 899 F.2d 291, 294 (4th Cir. 1990). When damaged but salvageable goods are tendered to the owner, the carrier's liability for further damages terminates. *Oak Hill Cap & Gown, Inc.*, 889 F.2d at 294. The general rule for determining the amount of damages under this section of the Amendment is "the difference between the market value of the property in the condition in which it should have arrived . . . and its market value in the condition it did arrive." *Id.* at 296

(quoting *Contempo Metal Furniture Co., v. East Texas Motor Freight Lines, Inc.*, 661 F.2d 761, 764 (9th Cir. 1981)). Courts have also held that "expenses incurred in examining a damaged shipment to ascertain the extent of loss prior to repair . . . are recoverable actual losses incident to a repair effort." *Vacco Indus. V. E.L. Murphy Trucking Co.*, 168 Cal.App.3d 262, 273 (1976), *cert. denied*, 431 U.S. 916 (1977); *see also Automated Donut Sys., Inc. v. Consolidated Rail Corp.*, 12 Mass.App.Ct. 326, 335-36 (1981).

Merchants' damages in this case include the value of the frozen salmon at the time of the theft ($63,184.00), minus the payment Merchants received from the salvager who ultimately bought the salmon ($6,354.00), plus the cost of the lab tests run to determine the extent of the damage done to the salmon ($729.00). Neither the $9,849.18 that Merchants incurred by hiring Castle Security Group to investigate the theft,[5] nor the $2,711.65 that Merchants determined it spent in storing the salmon in its own warehouse,[6] qualify as actual loss or damage to the salmon itself. Merchants' damages for the non-delivery of the frozen salmon are, therefore, $57,559.00.

### d. L&O Has Not Proved that the Theft Resulted from Merchants' Negligence.

As explained above, Merchants proved its *prima facie* case of Carmack Amendment liability against L&O.   As a result, the burden shifted to L&O to prove (1) that it was not negligent in its care of the frozen salmon and (2) that non-delivery resulted from one of five

---

[5] Indeed, Halpert admitted that his decision to hire Castle Security Group was a business decision designed to show The Fishin' Company, an important client, that Merchants was willing to go "three extra miles" to resolve the matter. (Halpert Test., March 6, 2012.)

[6] The costs Merchants incurred in storing the salmon are speculative at best. Halpert testified that Merchants calculated its storage costs by multiplying the storage rate it would have charged The Fishin' Company for 2,200 cartons of frozen salmon by the number of months for which Merchants stored the recovered salmon before selling it. However, no evidence was submitted regarding the length of time for which The Fishin' Company's products were typically stored, or how the recovered status of the salmon affected the length of time that passed before the salmon was sold. Furthermore, Merchants submitted no evidence regarding the actual cost to the company of storing the recovered salmon in its own warehouse. For example, Merchants did not demonstrate that storing the salmon impeded Merchants' ability to store products for its paying customers.

statutory exceptions to liability.[7] L&O argued against liability based on only one of those five exceptions, suggesting that Merchants negligently failed to secure its own premises.  However, L&O has not carried its burden.

Under Maryland law, negligence means doing something a person using reasonable care would not do, or not doing something a person using reasonable care would do. *Muse v. Supervalu, Inc.*, Civil No. WGC-10-1105, 2011 WL 1980607 at *12 (D.Md. May 20, 2011) (citing Maryland Civil Pattern Jury Instruction 19:1). Ordinary or reasonable care means "that caution, attention or skill a reasonable person would use under similar circumstances." *Id.*

The evidence showed that the loading dock at Merchants' Kresson Street warehouse was lit, that the truck yard adjoining the Kresson Street warehouse was unlit, that a seven- or eight-foot tall chain link fence surrounded the truck yard and loading dock areas, that the gate to that fence was secured with a lock, that Merchants did not monitor the loading dock and truck yard area with video cameras, and that Merchants did not have employees at the facility 24 hours a day. (Joint Exh. 15; Halpert Test., March 6, 2012; Draper Test., March 6, 2012.) The evidence further showed that the Merchants warehouse in Jessup, Maryland, a newer facility, utilizes security cameras and is staffed around the clock. (Halpert Test., March 6, 2012.) None of the evidence, however, articulated standard security practices in the industry or indicated whether Merchants' security practices at the Kresson Street warehouse deviated from those standards. None of the evidence demonstrated that Merchants' security measures differed from those that a reasonable person would have implemented in a similar situation.

Indeed, this Court has seen no evidence that would enable it to compare Merchants' security measures to those that would have been implemented by a reasonable person.

---

[7] The five statutory exceptions to Carmack Amendment liability are: an act of God, the public enemy, the act of the shipper himself, public authority, or the inherent vice or nature of the goods. *Missouri Pac. R.R. Co.,* 377 U.S. at 137–38.

Regardless of whether L&O behaved negligently in its role as a carrier of the salmon, L&O has failed to demonstrate that Merchants was itself negligent. As a result, L&O has failed to meet its burden and cannot avoid Carmack Amendment liability.

### B. Whether Merchants Filed an Insurance Claim for the Loss of the Salmon Is Not an Issue that Can Be Considered by the Court.

Elmore's counsel reasoned that Merchants failed to properly mitigate its damages by failing to file an insurance claim for the frozen salmon. This argument fails.

Maryland courts follow the collateral source rule when determining damages suffered by a plaintiff. "It is generally well settled [under Maryland law] that the fact that the plaintiff may receive compensation from a collateral source . . . is no defense to an action for damages against the person causing the injury." *Kremen v. Md. Auto. Ins. Fund*, 770 A.2d 170, 175 (Md. 2001) (quoting *Sainsbury v. Pa. Greyhound Lines,* 183 F.2d 548, 550 (4th Cir.1950)); *see also* 8 Md. Law Encyc. Damages § 41 (2012) ("As a general rule, the wrongdoer is not entitled to have damages for which it is liable reduced by establishing that the plaintiff has received or will receive compensation or indemnity for the loss from a collateral source, wholly independent of him or her."). Maryland courts apply the collateral source rule in Carmack Amendment cases. *See Newth-Morris Box Corp. ex rel. Auto. Ins. Co. of Hartford, Conn.v. Pa. R.R. Co.*, 78 A.2d 655, 660 (Md. 1951) (a shipper was able to maintain a lawsuit against a carrier of goods that were damaged in transit, even though the shipper had received payment from its insurance company to cover the loss, and noting that, "It does not matter . . . whether the proceeds of such a judgment belong to the equitable plaintiff [the insurer,] or whether they belong to [the plaintiff's sister corporation,] or what is the proper adjustment to be made between the two . . . corporations and the insurer.")

Merchants carries a warehousemen's legal liability policy to cover losses due to the company's negligence. (*See* Halpert Test., March 6, 2012.) Merchants did not file a claim with its insurance company for losses sustained as a result of the theft of the salmon. (Halpert Test., March 6, 2012.) Merchants' ability to recover from L&O, however, does not depend upon whether Merchants did or could collect on an insurance claim related to the loss of the salmon. Under the collateral source rule, this Court may not consider evidence of whether Merchants has received or will receive insurance payments when considering the extent to which L&O is liable for damages. Using the principles underlying the collateral source rule as a guidepost, this Court will not consider Merchants' failure to submit an insurance claim to be a failure to mitigate damages.

### C. The Placement of the Containers in Merchants' Kresson Street Truck Yard Does Not Constitute a Bailment.

At trial, Elmore also suggested that the Carmack Amendment analysis was irrelevant to this case because Elmore had effectively bailed the shipment of frozen salmon back to Merchants when he left container EMCU5205253 on Merchants' property. The facts of this case, however, cannot be shoe-horned to fit within the legal paradigm of bailment, and Elmore's argument is unavailing.

"A bailment is 'the relation created through the transfer of the possession of goods or chattels, by a person called the bailor to a person called the bailee, without a transfer of ownership, for the accomplishment of a certain purpose, whereupon the goods or chattels are to be dealt with according to the instructions of the bailor.'" *Danner v. Int'l Freight Sys. of Washington, LLC*, Civil No. ELH-09-3139, 2012 WL 627984 at *10 (D.Md. Feb. 23, 2012) (citing *Broadview Apts. Co. v. Baughman,* 350 A.2d 707, 709 (Md.Ct.Spec.App. 1976)). Under Maryland law, a bailment consists of the following elements: (1) an existing subject matter; (2) a

contract with reference to it which involves possession of it by the bailee; (3) delivery, actual or constructive; and (4) acceptance, actual or constructive. *Sullivan v. Gen'l Helicopters, Int'l*, 564 F.Supp.2d 496, 503 (D.Md. 2008); *Broadview Apartments Co.*, 350 A.2d at 709; *see also* Paul Mark Sandler & James K. Archibald, *Pleading Causes of Action in Maryland* § 2.20, at 73–74 (4th ed. 2008, 2010 Supp.)  "[T]he general rule is that, in order to constitute such a delivery, there must be a full transfer, either actual or constructive, of the property to the bailee, so as to exclude the possession of the owner and all other persons, and give to the bailee for the time being the sole custody and control thereof." 1 A.L.R. 394 § (1)(b) (originally published in 1919). "Once the bailment relationship is proven certain responsibilities flow from the relationship. The bailee in accepting possession of the bailed property assumes the duty of exercising reasonable care in protecting it." *Broadview Apartments Co.*, 350 A.2d at 709 (citing *Hambleton v. McGee*, 19 Md. 43 (1862)). A bailee, however, "is not an insurer and owes only such duty of care as persons of common prudence in their situation and business usually exercise towards similar property belonging to themselves." *Id.* (citing *Trans-System Service, Inc. v. Keener*, 239 A.2d 897 (Md. 1968)); *see also Fox Chevrolet Sales v. Middleton*, 99 A.2d 731 (Md. 1953).

Elmore appeared to argue that he, the bailee of the frozen salmon, temporarily bailed the salmon to Merchants when he left container EMCU5205253 in Merchants' truck yard. Elmore seemed to suggest that Merchants accepted temporary possession of the salmon as a bailee before it accepted final delivery of the same. This argument is unavailing. Even if Elmore had proved the other elements necessary to create a bailment under Maryland law, Elmore cannot show that he delivered the salmon to Merchants.

As discussed more thoroughly above, Elmore did not fully transfer control of container EMCU5205253 and its contents when he left the container in Merchants' truck yard on October

23, 2008. Merchants did not have full control of container EMCU5205253 and its contents because Elmore had secured the container with his own kingpin lock, for which he had the only key. *See Broadview Apartments Co.*, 350 A.2d at 710 (no bailment existed where car owner parked his own car in a parking garage, locked the car, and took the keys with him because there was no evidence to show that the parking garage operator "had a set of keys for the car or had any right or authority to move or exercise any control over the car"). Merchants could not move container EMCU5205253 or access its contents without further action by Elmore.

Even if Elmore had proved that a bailment relationship existed, neither he nor L&O have shown that Merchants was negligent in its care of container EMCU5205253. *See* § II.A.d., *supra*. A bailee is not the insurer of the property's safety. Elmore's contention that Merchants is liable as a bailee is therefore ineffectual.

### D. Elmore Owes Indemnity to L&O Under a Plain Reading of the Owner Operator Lease Agreement.

As detailed above, the Agreement signed by Elmore and by L&O representative Otto Thompson is a valid contract that bound both parties. As a result, the language of the Agreement must be interpreted to determine the intention of the parties. Maryland's Court of Appeals has "long adhered to the objective theory of contract interpretation." *Myers v. Kayhoe*, 391 Md. 188, 198 (2006).

> Under the objective theory [of contract interpretation], a court construing an agreement . . . must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated. In addition, when the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed.

*Id.* (internal citations omitted).

The Agreement between L&O and Elmore contains two clauses that expressly address whether Elmore owes indemnity to L&O for claims made by third parties. Specifically, the Agreement states:

> 6. Claims: **Contractor agrees to reimburse Carrier for all amounts which Carrier pays to third parties in settlement of any claims for loss or damage to persons or property occurring during, arising out of, or occasioned by Contractor's services to Carrier or to any equipment or property while in the custody of Contractor or its personnel.** Contractor warrants and represents that it shall make no claim against Carrier for any liability or responsibility for any damage to Contractor's equipment or property.

> 10. General Indemnity: **Contractor agrees to indemnify, defend and hold Carrier harmless from any loss, expense of [sic[ claim including attorney fees against Carrier for any type of injury of [sic] damage to any person of [sic] property** including Contractor, its employees of [sic] agents **as a result of any act or failure to act by Contractor, its employees or agents arising out of or occasioned by the services provided by Contractor to Carrier under this Agreement.**

(Joint Exh. 1 at ¶¶ 6, 10 (emphasis added).) The language of the Agreement is clear. Because L&O is liable to Merchants for the non-delivery of the frozen salmon held in container EMCU5205253, Elmore, in turn, owes indemnity to L&O.

Elmore's argument that he cannot owe indemnity to L&O because he was not negligent fails under a plain reading of the Agreement. The indemnity clauses quoted above do not limit Elmore's duty of indemnity to those situations in which Elmore or his employees acted negligently. Rather, Elmore owes indemnity to L&O for all amounts that L&O pays to third parties for all claims of loss or damage arising from Elmore's work as a contractor with L&O.

### E.  It is Appropriate to Award Prejudgment Interest to Merchants.

When deciding cases involving a federal question of law, federal courts have the discretion to award prejudgment interest. *Oscar Meyer Foods Corp. v. Pruitt*, 867 F.Supp. 322, 328 (D.Md. 1994). "If the purpose of the substantive statute which is involved is to compensate a

victim, then pre-judgment interest is appropriate." *Id.* Because the purpose of the Carmack Amendment is to compensate shippers whose goods are damaged while in a carrier's possession, the award of prejudgment interest is proper. *Id.* (citing *Co-Operative Shippers, Inc. v. Atchison, Topeka and Santa Fe Ry. Co.*, 624 F.Supp. 797, 800 (N.D.Ill. 1985)). "The essential rationale for awarding prejudgment interest is to ensure that an injured party is fully compensated for its loss." *City of Milwaukee v. Cement Div., Nat. Gypsum Co.*, 515 U.S. 189, 195 (1995).

The Court finds that Merchants' loss began on the date that it actually paid The Fishin' Company for the value of the stolen salmon.[8] The Court further finds that the appropriate rate of prejudgment interest to properly compensate Merchants for its loss is the prime interest rate. The Court takes judicial notice of the fact that the prime interest rate was 4.00% from October 29, 2008 through December 16, 2008, and that it has been set at 3.25% since that time.

### III.    Conclusion

For the foregoing reasons, the Court finds L&O liable for $57,559.00 plus prejudgment interest, at the prime interest rate, compounded annually, to run from the date that Merchants paid The Fishin' Company for the stolen salmon through the date of this judgment. The Court also finds that Charles Elmore owes indemnity to L&O for this same amount. A separate Order follows.

Dated:  April 20, 2012                                    /s/
                                                Stephanie A. Gallagher
                                                United States Magistrate Judge

---

[8] The date of Merchants' payment to The Fishin' Company is not clear from the evidence entered at trial. The Fishin' Company invoiced Merchants for the value of the stolen fish on October 30, 2008, (Joint Exh. 4), but the settlement agreement between The Fishin' Company and Merchants was not signed until March 16, 2009. (Joint Exh. 8.)